and it is 24-11060. I will let everybody have a chance to get set up. We have a default. I've had one before. We just cancel. Yes, it's an efficient panel. And Mr. Green, you may proceed. I see that you have reserved three minutes for rebuttal. Thank you, Your Honor. May it please the Court. Jordan Green, appearing for Ricky Johnson. Over one year after Mr. Johnson was prescribed treatment for sepatitis C, he lodged a grievance, complaining that his prison doctor still had not begun treatment. That grievance was denied. And Johnson fared no better when he was transferred to the care of the appellee, Dr. Marler. Like Johnson's previous physicians, Dr. Marler also refused to begin treatment. You certainly quoted it accurately, the grievance. But was there a specific treatment he was talking about? Your Honor, he had been prescribed a specific treatment, a treatment called triple drug treatment at that time. But there's no indication in the record that Mr. Johnson appreciated that it was a specific treatment or was even asking for, certainly in his grievance, wasn't asking for any treatment. Well, certainly, I don't know that that's true. He seemed to be as sophisticated of a patient as you get. And he specifically said, I was prescribed a treatment by my doctor. There was only one treatment that we know about. It's the one that Dr. Choudhary, I might pronounce that wrong and I apologize, but Dr. Choudhary had prescribed for him in the, I think it's 2012. That's the one that hadn't been started and he wanted to start that treatment, right? Well, he wanted to start the treatment that he knew he was prescribed. I do think there's a question about whether Mr. Johnson specifically knew that it was triple drug. The test that you're asking for, though, is not a subjective test. It's not what he intended. It is whether it is objectively exactly the same issue or the exact same issue that was done. And so my question is, I think it's important to grieve what's there because he couldn't grieve something that didn't happen yet, right? Correct, Your Honor. Something happened two years later he couldn't know about. So the grievance comes in a context, and that context is Dr. Choudhary had said, you get the three-judge protocol. He hadn't gotten it for two years, and he says, I'm in this new prison where my doctor won't give it to me. I want my treatment, right? So that's correct, Your Honor. What I take to be behind Your Honor's question is that we have to assess the level of generality at which Parzik's rule of the exact same issue. Well, that's not quite where I'm going. It's hard to get in my mind, and you don't want to do that. Here is where I'm going, though, or at least one of the places. You argue in your brief that the district court got wrong the comparison of the grievance that we've now sort of pinned down a little bit to there, and I happen to agree with you. I think the comparison has to be to what the nature of the claim is, the nature of the lawsuit claim. So there I'm with you. What is the nature of this lawsuit claim? So with respect to Dr. Marler, it's a deliberate indifference claim. That's really broad, though. I mean, you can't just say in a complaint deliberate indifference and win. You have to say what someone was deliberately indifferent about. What was it alleged here that he was deliberately indifferent about? Failure to treat Johnson's horsemane hepatitis C. Was there more specific allegations that were made? Well, when this case came before the 11th Circuit the first time, we advanced three theories of deliberate indifference. That seems to be, I agree with you. I've read both your underlying brief and the oral argument, listened to the oral argument in the case. And there we were clear that there were three separate things, three very particular things, for which Dr. Marler was alleged to have been deliberately indifferent about. One was failing to perform the biopsy or the Fibershirt test for over two years, contrary to Dr. Choudhary had prescribed the biopsy test. That's right? That's correct. He could not have known Dr. Choudhary prescribed the biopsy test after the grievance had been filed by your client, correct? I'm not sure I understand your Honor's question. So what date was the grievance filed in this case? The grievance was in 2014. Okay. Can you tell me the date? I can tell you it if you want, but I assume you know it. I don't have the exact date. The grievance was filed on May of 2014. We'll call it by the date. When did Dr. Choudhary prescribe the biopsy that's at issue in Claim 1 that was raised in the last appeal? It was, I believe, I believe it was prior to that. No. I mean, not at least according to our own opinion, which discussed the undisputed material facts in the case. It came after that. Assume I'm right that it came after. You don't need to say I'm right, but assume I'm right for right now. That would mean that he could not have possibly grieved something that happened afterwards, right? Well, so I don't think that is supported by this Court's precedent and certainly the precedent of sister circuit courts. Well, if the precedent, if Parzik says that it has to be the exact same issue, and the issue is whether he received a biopsy, and the prescription for the biopsy didn't come until after the first grievance was done, how possibly could it be the exact same issue? So we think that that requires answering the question of what is the issue, and if the issue is failure to treat asepatitis C, and if the biopsy is viewed as essentially part of that treatment. The problem with that is that would allow you to say anything that came afterwards for ad infinitum can't be there. And Parzik doesn't support that. No precedent that you've relied on supports that. The other problem with it is, and this is why I started where I did, if you look at the grievance, the May 2014 one that we read from, it's talking about a specific treatment. It's talking about something in context. So it actually reads in part or actually reads in whole. The first sentence, I was approved for medical treatment for epititis C. It talks about a specific approval for a specific treatment, Dr. Chihari's prescription for the triple drug cocktail in 2012. It says medical staff refuses to begin treatment, the same treatment he's talking about, and responds that I missed my appointments, they're wrong about that, that's a violation of my rights. I would request my treatment, the same my treatment that he was approved for, to begin immediately. That has to be read in context. That can't just be hepatitis C. It has to be what I was specifically treated for, which was the three drug cocktail by Dr. Chihari, right? I don't think that's correct, Your Honor. I would grant you that of the three theories that we presented the first time, the biopsy is the hardest one to shoehorn into the original grievance. I grant you that. But I wouldn't go the next step and say that if a different drug protocol was available at the time Dr. Marler was treating Johnson, and here it was, direct acting antivirals were available. But there's one other fact that we know from the opinion, undisputed, which is that Dr. Chihari withdrew his original treatment that he had given in 2012 at the same time he gave the biopsy prescription. So, I mean, Your Honor, I think there's actually some nuance there to what the withdrawal actually meant. That's what our opinion says, though, and it says it's undisputed. Now, what is disputed is whether he understood what was said to him and how it was communicated. I think what he says is, I was sort of asked it or it was informed it, but I didn't necessarily agree to it. Dr. Chihari says no, that he consented to that. But it's undisputed that it was withdrawn in the summer of 2014 after the grievance. At that point, how can we say it's the exact same issue when later on he's at a different prison with a different doctor years later, and now with biopsy results, he's in a greater stage, is asking for treatment. So two points, Your Honor. First, even on kind of that view, the fact that it was withdrawn, the reason it was withdrawn is because Dr. Chihari said, there's a different type of drug that's going to hit the market shortly, and you're better off waiting for that. So it wasn't that you don't need treatment anymore. It was that— Without a doubt. But that's certainly something different than I was approved for my treatment, which is the subject of the May 2014 grievance. So, Sue, Your Honor, I think what we would say is, to use Parzak's phrase, the exact same issue. The issue here that he complained about was not failure to provide me with triple drug treatment. It's failure to provide me with treatment for my hepatitis C, medical treatment. And I think it's— But doesn't that become a catch-all? You're at one prison. You say, I have an illness, and I'm not being treated appropriately. And then as the prisoner is being transferred, there's no opportunity for the prison itself to understand that this grievance exists and that the prison has the opportunity to correct it, which is what the Supreme Court has said, that the PLRA gives corrections officials time and opportunity to address complaints internally. And as I understand it, for a GDOC in its operating procedures, the grievances are kept secured at the facility where they are lodged. They are only shared with another facility if they concern conduct at a previous facility. So under your theory, if he's grieving very broadly, I'm not getting treatment for this condition, how would the next prison that he's transferred to have an opportunity to address the complaint if they don't know about this? So, Your Honor, there's a legal point and a factual point I'd like to address. Legally, when cases like Woodford have that quote that you just gave, when they say corrections officials, I think we have to ask the question, who are the corrections officials? Are they at the facility level or the agency level? In Woodford, Justice Alito's opinion talks about how exhaustion requirements have a precedent in agency and Ministry of Laws, and he says the number one purpose of an exhaustion requirement is to protect the agency's authority. Later in Woodford, the third to last paragraph in Woodford, the court again uses the phrase corrections officials, and the court says corrections officials have strong incentives to create and maintain a grievance procedure that inmates view as fair. So again, it's clear that when Woodford says corrections officials, they're talking about the officials who create the grievance procedures. These are agency level officials. Let's talk about those for a second. So you actually point this part out, and this is section 6G5 of the GDOC procedures. Where a grievance is filed in reference to a different facility, the grievance coordinator at the offender's current facility will retain a copy of the grievance and will forward the original grievance to the grievance coordinator at the named facility. Now you point to that to show that you can, in fact, grieve another facility. At one, I happen to agree with you. That's a fair reading of that. But I think also a fair reading of that is you have to name the facility. Otherwise, and the reason for that is because the grievance coordinators are the ones who are responsible for investigating and shepherding the grievance, and so the only way to be able to tell the other facility is so that you know what it is so they can send it to that grievance counselor to then go through the grievance process. First of all, Your Honor, we don't agree with the other side's characterization of GDC's grievance procedures as that they have to be kept like in a locked file cabinet. I'm not talking about that. I read to you a provision that is cited in your own brief for the proposition that you can grieve a different facility at the one that you're at. I agree with you. But if you read what that section says, it says that you have to name the facility in the grievance, the other facility. That certainly wasn't done here. Well, Your Honor, we cited that provision only to make the broader point that GDC has one set of grievance procedures that apply across all prisons in the GDC system, public and privately run. That's true. That's all we were trying to kind of get across with that. I know, but I took the time to read every single one of the GDOC procedures, all of them beginning to end. And there it seems clear that you need to name the facility. And as you point out, if there's any principle, any sort of north star here, it's you have to follow your own procedures as long as they're available. No one has alleged unavailability here. But it seems to me that the GDOC procedures require naming the named facility. Well, Your Honor, I would answer your question with reference to this court's opinion of Brown v. Sykes. There, what this court said is that what is required under the PLRA, and all of it is required, is the prisoner provide in the grievance as much detail as he has or reasonably could obtain. So it's certainly not possible. Johnson didn't know he was going to be transferred to Jenkins. I'm not sure that works to your advantage here. That's the problem is he's grieving something he has no idea is actually going to happen. How could it possibly be the exact same issue for something he has no idea he's ever going to be there, doesn't know the doctor, doesn't know the treatment? He doesn't know. That's part of the problem is projecting the future seems to be the problem here. Your Honor, if the issue that's being complained about is conceptualized as failure to treat Johnson's hepatitis C, then you're right. Johnson didn't know how many doctors would continue to not treat his hepatitis C. Thank you. Thank you, Your Honor. I have some other questions for the other sides. Don't feel left out. Okay. Ms. Taylor. Good morning, Your Honors, and may it please the Court. Amanda Taylor for Dr. Marler, the appellee. So I'd like to start not where I started with your opposing counsel. I'd like to start with the other issue that's raised here, which is what I'll call the 12C issue. Do you agree, first of all, that the district court believed in his ruling that he had to allow the 12C motion because 12C required it, whether there was a good cause finding or not? No, Your Honor. Tell me why, where is the best part of either the order or the transcript on the hearing, like the telephonic hearing, that you get that from? Your Honor, when you read the telephonic hearing, and I trust that you have. All of it. What you see is a discussion primarily about the PLRA and the threshold legal issue that's presented as a matter of abatement. And when Judge Self at the very end of that culmination of discussion says that he feels hamstrung, I read that clearly as a reference to the PLRA's requirement and this court's precedent that he decide this issue. That's a good argument. I understand why you're making it. But if you read page 32, quote, I think the rules bind me up as far as Rule 12C. That's not a PLRA misunderstanding here. That is a I think 12C binds me to require this late thing, even though I'm really frustrated by it. And I just, given the hamstrung line and given that sentence and given the order, which also seems to indicate that 12C says this and I got to do it and no analysis at all of good cause under Rule 16, it seems to me that he misunderstood is what 12C required and what Rule 16, how that played into it. Your Honor, I think you have to read his comment about 12C in the context of the PLRA. And he is saying the type of issue that is being presented to me here under 12C is one that I do not have discretion to give to the jury. I don't have discretion to go on to trial. And now they have come. Because I'm required to address this issue and 12C gives them the mechanism, it binds me to allow them to bring it up. Well, it gives them a mechanism to have filed a motion for leave and then to come back with a renewed motion. Their motion for leave actually alternatively says or consider this a renewed motion under Rule 56. And so I think. We're not here under that. I mean, that may have been the right procedure to do it. And that may have not caused this issue. Exactly. And that goes to harmless error, Your Honor. So procedurally.  So let's talk about harmless error. So let's assume for the moment that I disagree with your reading and I agree with your opposing counsel's reading that the district court found himself bound by Rule 12C to put this in there. So I've thought about harmless. And the harmless question seems to be would I have considered this anyway under 12C? In other words, the way I look at it is there was just good cause on the record and I just didn't go through the analysis. Is that a fair sort of assessment of what harmless error would be here? I think harmless error here is there are multiple procedural avenues by which I could have and was required to decide this as a threshold legal question. Required is. So I know you make this point and you point to Sims for that proposition. But Sims didn't deal with someone who waived it or forfeited it by failure to raise it. In other words, the question here isn't when properly raised do you have to decide this? The answer is, of course, yes. But the harder question is where it's either not brought up at all you agree with. Let's say no one mentioned exhaustion. You agree with me that the district court doesn't have to do an exhaustion analysis, right? If Dr. Marler had not pled that. Nobody. Let's say nobody raised it ever. Correct. If Dr. Marler didn't plead it. Right. Because it's not jurisdictional. Correct. It's his burden to the affirmative defense.  So here we have a question of timeliness and timeliness goes to forfeiture. If you didn't raise it on time, then it's forfeited. And so it's not jurisdictional. He doesn't have to bring it up if it's forfeited. And so the question is, was this timely raised or not? The answer is no, it wasn't. We know that for a fact. I disagree with that respectfully. Okay. Well, okay. Tell me why. July 31st, 2019 was the deadline to raise this issue in a motion. Dr. Marler did that. The motion was heard before this case came on appeal the first time. The issue was not decided on the merits. It was a denial of a summary judgment based on genuine issues and material fact and an incomplete record. Under Mr. Johnson's argument, this court would have to hold that a denial of a summary judgment is a dispositive ruling on the merits that disposes of the issue. So what we have here is a timely raised legal issue on his affirmative defense. July 31, 2019, per the, I think it's a one line, I won't call it a scheduling order, but there's an email setting that deadline. So it was timely raised. It was heard. It was not disposed of. That affirmative defense remained pending and had to be decided. We've said that exhaustion generally, because it's an abatement, generally gets raised in the 12B context. That's correct. You brought this up in 12B, and there was a deadline on it, and this was past the deadline. So I don't disagree with anything you said about what happened. You're right about how it happened below. The magistrate judge did rule on it. The district court decided to go a different direction and rule on the merits only. We appealed that and sent it back. And for whatever reason, no one just said, hey, there's still an outstanding summary judgment issue, and you need to address that issue. That is exactly what our motion for leave said, is that this issue remains outstanding. And if you read their brief, especially their reply brief, they concede that this issue had to be decided, that it cannot go to the jury. If timely and appropriately raised. Right. And there is no other way that it could have been timely and appropriately raised other than the motion for summary judgment filed in July of 2019. That is absolutely what Dr. Marler was required to do and did. The fact that the magistrate and then Judge Self agreed that there were remaining fact issues, and so the affirmative defense would carry forward, if necessary, on remand as occurred. Then what happens? You are left with an unresolved affirmative defense that has to be resolved, had been timely raised. The mandate issued in November. Dr. Marler moved for leave in December. There was no delay on his part whatsoever. Judge Self says in his order, yes, you moved extremely quickly. I'm paraphrasing, but you moved extremely quickly on remand. That's what he felt hamstrung by, that frustration, the same frustration that this court feels, I can imagine, because you have this issue that has to be decided. There's nothing else Dr. Marler could have done. You're talking about the judge's order. What do we make of the fact that on page three he says, after expressing frustration, the court determined that the text of Rule 12c undoubtedly permitted. Permitted. It didn't say required. That's exactly right, Judge. Through his agonizing over what to do, he's demonstrating that he is exercising discretion. There's no doubt that he did have discretion to do it if he found Rule 16. And let's assume that that is an implicit finding of good faith. That gets us to the harmlessness part that I tried to start with. The problem is, both at the hearing and in his order, he specifically says that your client was dilatory. He specifically makes that finding. And the very essence of good faith, if you go to Sosa, sort of our opinion on good faith, that is the exact thing we say is not good faith. You cannot be dilatory and act in good faith. So the problem is, reading his own findings, and it may be that you argue that that's clear error, but reading his own findings, I don't see how we could say that it's harmless that he didn't explicitly make a finding of good faith, which I'm okay with. We're not in a magic words test. And it may be that he really felt permitted and not required. But he still is required to do something with Rule 16. We have to evaluate it on our own. And if the finding is dilatoriness, how do we find good faith? Your Honor, I appreciate the question. The standard is actually good cause. Good cause. I apologize. Not good faith. You're right. Good cause. I apologize. And there are reasons here that demonstrate good cause, including the PLRA's requirement that this be decided as a pretrial legal issue, and that there were no disputed facts. But what do we do with our case law, which says that where conduct is dilatory, it is not good cause? I think you have to contrast his frustration with what occurred prior to the appeal with his recognition of how quickly Dr. Marler moved the minute that mandate issued, and that he – There is nothing else Dr. Marler could – I can't get into the district court judge's mind. They have a lot going on, and I think the district court judge here did a great job and was on top of stuff and has tried this case and has granted summary judgment. I mean, he's been on top of it. There's no critique of the way he handled the case. But he made a finding on dilatoriness, and we've said that that is the antithesis of good cause under Rule 16. And so I just don't know how to reconcile those two things, even if there may be other reasons that possibly good cause could exist. I'm not sure what that would be, and I don't think the PLRA says that where an untimely motion is raised, you have to do this. I think the PLRA requires timeliness by everybody, so I'm not sure that that's the answer here. But I just don't know how to reconcile those two things. I think you reconcile it with a standard of review, which is abuse of discretion. And per your own description, you and I agree that there is no abuse of discretion by this judge who considered and weighed the various factors, considered the necessity of a finding before trial, looked at Judge Marler—I mean, excuse me, Dr. Marler's prompt behavior on remand. Dr. Marler could not have done anything different. He raised this in July of 2019. The fact that it wasn't disposed of on the merits before the appeal and then came back and had to be disposed of, he moved quickly. Judge Self recognized that. Yes, he was frustrated, but he did exercise discretion. He did not misinterpret Rule 12c. If he had believed that this was just a rote, mandatory rule, there wouldn't have been the back-and-forth discussion. He would have just granted— No, that's not—I mean, if he doesn't know going in whether it is and he's convinced that he's required to— which, by the way, you won. I mean, you did convince him of that, that you're required to consider this. I mean, the end is what we look at, not the beginning. He had a hearing because he wanted to hear both sides and hear what they had to say, and he ultimately agreed with you. So at least at the hearing, I don't know how to read it that way. I think, you know, Judge Branch's question to you is a good one, which is he didn't use the term required. He used the term permitted, which is sort of understanding of discretion. But that still only gets you to—then we have to look at Rule 16, and that requires good cause. And then I'm not sure how you get around the dilatoriness finding or at least reference. Your Honor, as I said, because there are multiple factors that contribute to the good cause here, I would like to touch on one point on the exhaustion claim, if the Court is willing to go back to that first issue, because I very much agree with your questions under PARSIC that this is substantively not the exact same, but there are actually two, I think, easier ways to affirm on the exhaustion question, and the first is simply that Mr. Johnson never filed a grievance at Jenkins. Yeah, but that can't be enough. It can't be. It's the first part of the test, because that's the PLRA. That is an available remedy. There is no argument by Mr. Johnson, not in almost 10 years of this litigation, that filing a grievance at Jenkins was unavailable to him. So that's the starting place. So there is a requirement to file at every institution? Under the SOPs, which we were discussing in the prior argument, they are a local facility procedure. Everything through the SOPs, and I, too, have read them line by line and word by word. You agree, though, with the section that I quoted that that does contemplate grievances at other facilities? Absolutely. I think that's the most important provision in the whole case for this purpose, because it is only a retroactive-looking provision. As you point out, the language in that… Well, I'm not sure that that's true. I don't know that you can get that from that. But my question to you is, do you agree with me that that regulation or that section contemplates filing a grievance at one place at your home prison? When you are at prison, let's call it prison B, you can file a grievance, quote, in reference to a different facility. Right, okay. The only way you could reference… So the rules don't limit it to just one. You have to be at your prison to do so. So I think we have to agree to that.  Then the question is, what do the rules require when you do that sort of thing? And I think that is a question that the parties, frankly, don't address in that much detail. What is required where we acknowledge that it can be done? Right. The plain language of the SOPs is you can file at Facility B, and the local coordinator will forward back to the facility from which you just came, right, or two times ago, wherever it is. It can be a different facility if it's retrospective. There is no provision whatsoever for filing at a future unknown where you might be transferred in the future facility. It's impossible under the plain language of the SOPs to read that as a prospective different facility because, as you point out, you have to name the facility, and then the grievance coordinator has to forward it. I'm not sure it's impossible. I'm sure I could think of a hypothetical and where it wouldn't be, but it would seem to be that the regulation requires naming of the other facility in which you're complaining about so that, for the reasons that Judge Branch articulated and the Supreme Court has, something can actually be done about it. Right. In other words, you've got to put people on notice of this stuff. Right, and notice is the name of the game under the PLRA. Sorry. And the regulation that allows you to file at a previous prison, like you've been transferred from Prison A to Prison B, and the regulation permits you to file a grievance at Prison B about Prison A, does that solve the concern that is raised by opposing counsel that if we were to implement a rule that you have to grieve at every prison, oh, the prisons are just going to keep transferring the inmate, and so the inmate is not ever going to be able to have its grievance addressed, his or her? Your Honor, I don't think that would be this court implementing the rule. I think that would be this court adhering to the plain language of the SOPs. But it addresses the hypothetical. It does address the hypothetical. And finally, Judge Luck, with a few seconds of grace, I just wanted to point the court. It's Judge Branch's call. You may finish that thought. In response to your questions about the difference between the lawsuit and the where grievance, the most important page of the lawsuit of the complaint is page 8, where Mr. Johnson references, quote, new drugs and a new standard of care. And there are several things that make the lawsuit not the exact same as the where complaint, as you've discussed, but page 8 really solidifies that. All right. Thank you, Ms. Taylor. Mr. Green, you have three minutes. Please. In Jones, when the Supreme Court struck down the Sixth Circuit's judicially created rule that a defendant or that a prisoner had to name all defendants who he later sued, everybody agreed that the Michigan Department of Corrections could have imposed that rule. And, in fact, by the time the Supreme Court heard Jones, the Michigan Department of Corrections had adopted that rule. Likewise, here, the Georgia Department of Corrections could very easily have, in plain language, said if an inmate is transferred to a new facility, he must file new grievance, with respect to the same condition he filed about earlier. Isn't the section that you reference and that I quoted to you, I mean, it's not as clear cut as you. You're a great lawyer. You would write this very differently. But isn't that as clear as probably can be that you have to name the facility if you're trying to do a different facility than the one that you're in? I think the most favorable interpretation of that provision, to the other side, is that it applies to specific instances where you are complaining about something that previously happened to you. And, of course, those situations are going to be pretty rare because GDC imposes a 14-day requirement that you have to file a grievance within 14 days. What about the requirement on the standard form that you name the persons involved, witnesses, and dates of the incident? Sure. So, I mean, no one in this case has argued that GDC imposes a name all defendants rule. That specific requirement, we think, just means like— I'll just say, it says this form must be completed in ink. You must include specific information concerning your grievance to include dates, names of persons involved, and witnesses. So, we think that's very consistent with what this court has said, that an inmate has to include all information that he has or reasonably could obtain. That doesn't apply to— But this seems to be a requirement consistent with what you just said the Michigan Department of Corrections can do post-Jones. Why is this not exactly that? First of all, I would say just from a technical point, the requirements are actually in the grievance procedures. It's just the grievance procedures— This is actually on the form that your client filled out. I mean, it's not like it's hidden. I understand, but when inmates are indoctrinated into GDC, they are given a copy of the grievance procedures. That includes the forms, though, and it says all grievances have to be on these forms. That's correct, Your Honor, but saying you have to include all the following types of detail, that doesn't mean that there's a requirement to include detail that isn't available yet at the time. I mean— Look, that's part of the problem. I agree. I mean, you can't include a name of someone for something that never happened. But, again, I would say if there was a name all defendants rule, GDC could accomplish that very easily. In language that we wouldn't be able to debate or contest, but they didn't do that, and it's the other side's burden to show failure to exhaust. If I could just briefly address the 12th C point, Your Honor. You've got two seconds. Well, I don't think I'll have time to do— Now you don't. Thank you. All right. Thank you. Thank you both. We have your case under advisement, and we are in recess until tomorrow morning.